[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This case was filed by the plaintiff on March 18, 1986 in Providence Superior Court. On January 22, 1988, Mr. Justice Cresto appointed Leonard A. Kiernan, Jr., Esquire to act as a Special Master to assist this Court due to the voluminous business records and testimony which were essential in the trial of this case. The Master's Report was completed on April 20, 1990 and further findings of the Special Master filed on August 16, 1990.
Briefs were filed by plaintiff and defendants pursuant to the Master's Report with final reply briefs filed by the parties in October of 1991.
The Master was appointed pursuant to R.C.P. #53 entitled "Masters" by Mr. Justice Cresto without agreement of the parties pursuant to R.C.P. 53(2) in an action to be tried without a jury and upon a showing that some exceptional condition required the appointment of the Special Master.
This undertaking by Master Kiernan was of gigantic proportions encompassing several witnesses and resulting in thirty-five volumes of testimony recorded and in evidence as well as a great number of business records similarly introduced.
The case involved the purchase and sale of Lobstr Associates, Inc. by the plaintiff, P.F.G. Corp., owned by Galego Oil of which Paul Galego is sole stockholder.
The action filed in the Superior Court is for breach of contract and requires the adjudication of the meaning and effect of the agreement of purchase and sale and particularly of two written agreements executed by the parties: an Asset Purchase Agreement, hereinafter referred to as the "A.P.A.", and an Agreement not to Compete, hereinafter referred to as "A.N.C." and collectively referred to as the "Agreements".
The defendants are T. Brian Handrigan, Stephen R. Heard and John Rutkevicz, hereinafter referred to as HHR; Lobstr Associates, Inc. owned by HHR Robert D. Mitchell; Warwick Cove Shellfish, Inc., owned by HHR and Mitchell; Warwick Cove Holding Co., a partnership comprised of HHR and Mitchell and Mitchell Seafood, Inc., owned by Robert Mitchell.
The Agreements contained substantially identical non-competition provisions which form the basis of two substantive claims before the Court.[1] These claims are that the defendants illegally established a new hard shell clam "buy station" and that defendants illegally increased their market share of hard shell clams above $1,000,000.
The third substantive claim is that defendant Handrigan breached a contractual provision which granted the plaintiff the right of first refusal on all lobsters harvested by defendant Handrigan at a price set by Handrigan.
The appropriate standard of review of determinations made by a Special Master by the Superior Court is that the Special Master is empowered to make findings of fact not conclusions of law. That even if conclusions of law were authorized, the Court must resolve legal issues de novo. Monmouth County CorrectionalInmates v. Langaro, 595 F. Supp. 1417 (D.N.J.) 1984.
The findings of fact made by a Special Master are entitled to great deference by the Court. R.C.P. 53(e)(2) provides, that in non-jury actions, a court shall accept a master's findings of fact unless those findings, the Court believes, are clearly erroneous. Kerney v. Kerney, 120 R.I. 209, at 211;386 A.2d 1100 at 1101 (1978).
Findings of fact are clearly erroneous only where "the totality of the evidence leaves the reviewing court with a definite and firm conviction that a mistake has occurred." In reDerek, 448 A.2d 765 at 765 (R.I. 1982) (citing State v.Riendeau), 448 A.2d 735 at 737, (R.I. 1982).
"Mixed questions" involve issues of fact and issues of law. Determining the meaning of an ambiguous contractual provision raises a "mixed question", as such a determination requires the application of the rules of contract construction to the language of and facts surrounding a particular contract. It is a task for the finder of fact to determine mixed questions. Cassidy v.Springfield Life Ins. Co., 106 R.I. 615; 262 A.2d 378 (1970). Therefore it was proper for the Special Master to interpret ambiguous contractual provisions.
The Master's findings on these mixed questions are accorded some deference but not the same deference of findings of fact, because mixed questions involve conclusions of law. Town ofBarrington v. Gadd, 569 A.2d 231 (N.H. 1990).
Therefore, this Court must determine if the Master's interpretation is supported by the totality of the evidence and whether the interpretation is erroneous as a matter of law.Wendward Corp. v. Group Design. Inc., 428 A.2d 57 at 61 (Me. 1981).
In the case at bar, the plaintiff's proposed implementation of the standard to be followed by the Court is at odds with the defendants' interpretation of the same standards. The Court will, with regard to "mixed questions", strike down the Master's mixed findings if they are not supported by the evidence or are erroneous as a matter of law.
Therefore, whether a disputed contractual provision is ambiguous is a question of law for the Court to decide. If a provision is unambiguous, then the Court must also determine its meaning as a question of law. If a provision is ambiguous, determining its meaning is a question for the Master. The Court will review such determinations under the "clearly erroneous" standard of R.C.P. 53(e)(2).
The Court in reviewing the Special Master's findings pursuant to the standards outlined earlier, has considered the briefs submitted by counsel, reviewed the exhibits and the voluminous transcript and will adopt and incorporate by reference the findings of the Special Master as appropriate. The Special Master's Report will be appended to this decision and made a part hereof.
In its first claim, the plaintiff alleges that the defendants opened a new hard shell clam buy station in violation of non-competition provisions of the agreement, specifically violating section 3.4(c)(2) of the A.P.A. and section 2.02(b) of the A.N.C., each of which provides for only two buy locations already in existence, one at Oakland Beach, Warwick and one in Tiverton.
Master Kiernan conducted extensive hearings on this question and concluded as a finding of fact that the defendant, Robert Mitchell, opened a buy station. That buy station competed with the plaintiff and was a clear violation of the A.P.A. and the A.N.C. (exhibit 5). The Special Master also found as a fact that defendant Mitchell was an "interested party;" that he received consideration for the sale of Wickford Shellfish and was an owner of Wickford Shellfish, the denials of the defendants notwithstanding.
The reason for these findings of the Master is that Mr. Mitchell signed the A.P.A. with the other three defendants. He signed under the heading of Warwick Shellfish Co. and agreed not to compete with the purchaser (the plaintiff) for a period of five years — by limiting their buy locations to Oakland Beach and Tiverton, Rhode Island.
There were four subsequent agreements entered into whereby all parties agreed to limit themselves to the two existing buy stations. All parties jointly and severally agreed to be so bound not to compete directly or indirectly with the plaintiff.
These findings of the Master, the Court determines, are supported by the written and testimonial evidence on the record and are not erroneous as a matter of fact.
That the Mitchell Seafood was a "buy location" within the meaning of the agreements was a mixed question of fact and law. That the parties were all jointly and severally liable and agreed not to compete with the seller directly or indirectly nor open any new buy locations is a matter of law for the Court to decide de novo.
The contract provisions on these questions were not ambiguous and their interpretation therefore is a question of law. After a review of the record and findings of the Master, this Court finds as a conclusion of law that parties, the seller, stockholder, partners, interested parties and affiliated persons did agree that they and any affiliated persons would limit their buy locations to Oakland Beach and Tiverton. The Court also finds that Mitchell is not only an "affiliated person" under the signed agreements, but that he is also an "interested party" and as such is jointly and severally liable to abide by the agreement not to compete. In addition, that by signing the documents, exhibits 4 and 5, by the clear and unambiguous meaning of the letter dated May 31, 1984, from the plaintiff to Mr. Mitchell (exhibit 62) indicates that there was an affirmative agreement and intention on behalf of the parties not to compete with the plaintiff, P.F.G. Corp.
The parties do not dispute the Master's finding that damages for the plaintiff's first claim amounts to $478,444.61. This figure represents the profit made by Mitchell from hard shell clams that should have gone to the plaintiff. This Court, having upheld the Master's findings of fact on this claim and in light of the conclusions of law found by this Court, hereby orders the defendants to pay said amount with interest calculated according to the Fleet Bank prime rate for the period in question as set forth in the agreements.
The second claim of the plaintiff, addressed by the Special Master, was whether or not the defendants had increased their market share of hard shell clams contrary to the signed agreements and what that market share represented in dollars.
There is no dispute between the parties that $102,349.00 is the measure of damages, if any, in this case.
The Master had to deal with the question of the agreement of the parties not to increase market share, what that market share was and whether or not it had, in fact, been exceeded.
After considering the agreements in evidence and weighing the testimony of the witnesses, the Master concluded that the parties did agree not to increase market share of hard shell clams, but that the parties did not agree that there was a one million dollar ceiling on the defendants when the agreements were executed.
These findings were based on two subsidiary findings. The Master concluded that the agreements, A.N.C. and A.P.A. did not incorporate the schedule which contained the one million dollar language. After reviewing the schedules themselves, the Master found that they do not clearly limit the defendants to a one million dollar in sales.
As a result of this analysis, referring to dual ambiguity, the Master concluded as a matter of fact that he could not find that the "share of the market", as referenced in the agreements, meant one million dollars.
The Master further found that in determining the defendants' market share, inflation must be considered.
The Master found that the terms "market share" provision and "schedule" were ambiguous. The interpretation of each term presents a question of fact for the Master which must be reviewed by this Court under the "clearly erroneous" standard of R.C.P. 53(e).
After a review of the Master's findings and the exhibits and briefs of all parties, the Court concludes that the Master's findings that the parties did not agree to a one million dollar market share was not "clearly erroneous." Judgment shall enter for the defendants on this claim.
The most significant evidence supporting this finding is the A.N.C. itself. The market share provision, unlike the provisions immediately preceding and following it, does not specifically incorporate Exhibit A. Only the "buy location" provision which precedes the "market share" provision, incorporates this exhibit. This strongly suggests that Exhibit A has no bearing on the meaning of "market share."
Further, Exhibit A itself supports the Master's conclusions. First, it is not at all clear that the one million dollar figure was intended to be a limit. The purpose of section 2, of Exhibit A is unrelated to the market share provision. It is there to introduce a customer list. If section 2 was intended to set out a limit, it would have, and certainly should have, set forth anactual figure, not the "approximately one million dollars annually" referred to in the exhibit.
The Court also finds that the Master concluded by implication that "market share" refers to the quantity of clams sold, not their monetary value and that this finding is supported by the weight of the evidence.
The Court, after a review of the evidence, believes and finds as a fact, that the market share of the defendants as understood by the parties was $1,449,102.
The Master implicitly made the same determination of market share of Lobstr Associates for the "base year" as $1,449,102 as indicated by Lobstr Associates in its 1984 tax return.
The third claim addressed by the Special Master is the plaintiff's allegation that defendant Handrigan violated a contractual provision which required defendant Handrigan to sell to plaintiff, at market prices, lobsters harvested by defendant Handrigan.
The Master found that the contract only obligated defendant Handrigan to offer his lobsters to plaintiff at a price, not the harvester's going price. He also found that plaintiff did not sustain its burden of showing that the defendant had sold his lobsters at prices lower than those he offered to the plaintiff.
The language in section 3.01 of the A.N.C. clearly obligated defendant Handrigan to offer his lobsters to the plaintiff at a
price.
The plaintiff argues that the purpose of the language was to insure a steady supply of lobsters to plaintiff once plaintiff got established in the seafood distribution business — and that the proper interpretation of that language should be construed in a manner that would further that purpose. The plaintiff has also cited case law stating that contracts should be interpreted in a way that makes them fair and reasonable.
The defendants argue that section 3.01 unambiguously grants defendant Handrigan the right to set any price he chose and that section 3.01 only guaranteed the plaintiff the right of first refusal on the purchase of the lobsters.
The defendants also argue that the plaintiff's interpretation of the purpose of the language in section 3.01 is speculative and could equally be interpreted to benefit defendant Handrigan to enable him to work as a lobsterman (since defendant Handrigan was exempted from the agreement by section 3.01).
The Court must examine the language of section 3.01 to determine whether or not it is ambiguous. The Court upon inspection concludes that the language of section 3.01 is not ambiguous.
The section clearly obligates the defendant to "first offer" the lobsters to plaintiff at such price as he (defendant Handrigan) is willing to sell. He must also, if the price is later reduced, again first offer to sell the lobsters to the plaintiff at that reduced price.
The provision clearly states that defendant Handrigan can price his lobsters at whatever level "he is willing to sell." The plaintiff's argument that defendant Handrigan is obligated to sell his lobsters to the plaintiff at "boat captain's prices" is not supported by the credible evidence in this case and the Court rejects this argument.
The Master found that defendant Handrigan did not violate his obligation to the plaintiff by refusing to first offer the lobsters to the plaintiff. The Master found that defendant Handrigan's prices were above "boat captain's price" and that defendant Handrigan produced two witnesses, Messers. Voelker and Tucker who testified that they paid the prices asked by the defendant for his lobsters. These prices were above "boat captain's prices".
Findings of fact made by the Master particularly after personally hearing live testimony and being able to weigh the credibility of the witnesses, personally, should be given great weight by the Court. In this case, the credibility of Messers. Voelker and Tucker was tested by the Master and he found the witnesses to be credible.
Upon a review of all facets of this claim and the findings of fact made by the Master, the Court concludes that defendant Handrigan did not violate the terms of section 3.01 of the A.N.C.
The Master's findings originally addressed five separate issues, or claims, put forward by the plaintiff. Three of these issues have been addressed by this Court, the other two issues involving extraordinary lobster mortality and extraordinary credit losses have previously been resolved by the parties.
The remaining issue not directly addressed in the Master's findings is the question of attorney's fees requested by the plaintiff pursuant to sec. 7 of the First Supplement to the A.P.A. which provides:
 (7) As to the promissory note referred to in 2.1(b) of APA, and Schedule 2.1(c); the note shall be unconditional and not subject to breach of contract defenses. If Purchaser institutes suit or counterclaims for breach of the agreement by any of the other parties, Sellers and Stockholder-Partners will, if Purchaser prevails, indemnify Purchaser for its reasonable costs incurred in such litigation, including reasonable attorneys fees and interest at 5% over average prime rate from the time suit is instituted until payment (but not exceeding the rate allowable by law) on account of opportunity costs of capital.
This issue is a matter of law which the Court must resolve. The parties do not dispute that paragraph seven would authorize attorney's fees in this case. The parties are not contesting whether the hours and rates were reasonable. Further, the defendants do not dispute whether P.F.G., if it prevails on only one of three claims would have "prevailed" within the meaning of paragraph seven.
What the parties do dispute is only the amount of fees that should be awarded in the event that P.F.G. is partially successful. The plaintiff claims that if it is successful on one claim, it has "prevailed" within the meaning of the (First) Supplement and is entitled to all of its attorney's fees for work performed on the entire case. The defendants argue that the plaintiff should collect only for work done on the successful claim. It is this dispute that the Court must resolve.
The parties have not cited, nor has independent research discovered, Rhode Island authority addressing this issue. The defendants have cited two federal cases interpreting a federal civil rights statute which allows the prevailing parties to collect attorney's fees. Nadeau v. Helgmoe, 581 F.2d 275 (1st Cir. 1978) was a prisoners' suit under 48 U.S.C. § 1988 challenging their conditions of confinement. Although they were unsuccessful on other claims, the plaintiffs prevailed on an issue involving access to the prison library. The district court held that, because the plaintiffs were only partially successful, they were not entitled to any attorney's fees. The First Circuit reversed holding that:
 The plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. However, the amount of attorney's fees they receive should be based on the work performed on the issues on which they were successful. Id. at 278.
The court in that case reasoned that proportionability should be considered when arriving at a fee award. Id. at 279.
Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933 (1983), further explained § 1988 attorney's fees awards for partially successful plaintiffs. In that case, the United States Supreme Court also stated that fees should be awarded only if based on successful claims. And, where an unsuccessful claim has no legal or factual relation to a successful claim, the "prevailing" party cannot collect for the work performed on that unsuccessful claim.Id. at 434-45. The court also emphasized that the trial court has discretion, to be exercised in light of the above considerations, to determine the amount of a fee award. Id. at 437. It stated that trial courts should have discretion in resolving these issues because of the desirability of avoiding frequent appellate review of what are essentially factual matters. Id.
Other states have applied the rationale expressed in Nadeau
and Hensley, and allowed fees for some claims but not others, when awarding attorney's fees under a contract. In 4M Linen Uniform v. W.P. Ballard Co., 793 S.W.2d 320 (1990), the Court of Appeals of Texas, Houston, was presented with multiple claims. The terms of the contract authorized attorney's fees only for some of the claims. The court held that fees incurred litigating authorized claims could be collected, but that fees incurred litigating unauthorized claims could not. The court required that the claimant segregate the authorized and unauthorized fees and allowed recovery of a portion of its attorney's fees. In Greb v.Murray, 795 P.2d 1087 (1990) the Court of Appeals of Oregon was presented with the same issue and reached the same holding.
Although this case, which involves only "authorized" claims under a contract, is slightly different from the cases discussed above, the reasoning in those cases — which mirrors the reasoning in Hensley and Nadeau — should apply. Thus, plaintiff should be awarded only the portion of its attorney's fees incurred in litigating its successful claims.
Further, a partial award of attorney's fees comports with sound policy considerations. Attorney's fees provisions are favored because they allow promisees to protect the benefit of their bargain where promisors default. See, Washington Trust,
256 A.2d at 494. This policy should not apply, however, where the promisee has not proven the promisor has defaulted.
Therefore, since the plaintiff has prevailed on one of its three claims, this Court will award reasonable attorney's fees for services rendered on the successful claim only. Fees incurred pursuing issues not relevant to a successful claim shall not be awarded.
In as much as the five original claims of the plaintiff were separate and distinct issues of law and fact and the plaintiff prevailed on one of the three remaining claims, the Court concludes as a matter of fact and as a conclusion of law, that the plaintiff shall submit for Court approval, a claim for reasonable attorney's fees incurred in the successful claim consistent with this decision.
[1] The Special Master initially addressed five categories in his report, plus attorney's fees; this decision will address three categories plus attorney fees.